**Barbara S. CODAY, Plaintiff,**

v.

**METROPOLITAN LIFE INSURANCE CO., Defendant.**

**No. 01–1130–JTM.**

United States District Court,
D. Kansas.

Feb. 8, 2002.

John L. Brennan, Brennan & Keil, Wichita, KS, for Plaintiff.

Jeffrey A. Burns, Douglas W. Robinson, Shook, Hardy & Bacon L.L.P., Kansas City, MO, for Defendant.

## MEMORANDUM AND ORDER

MARTEN, District Judge.

This matter comes before the court on defendant's motion for summary judgment on plaintiff's claim for long-term disability ("LTD") benefits from the Raytheon Aircraft Company Employee Group Long Term Disability Plan (the "Plan"). The motion is fully briefed and ripe for determination. For the reasons set forth below, the court denies defendant's motion.

## I. Statement of Uncontroverted Facts

The court bases the following facts exclusively on the administrative record submitted by defendant. The Plan, which is an employee welfare benefit plan governed by the Employee Retirement Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001–1469, is administered by Raytheon Aircraft Company ("Raytheon"), i.e., Raytheon is so designated under the terms of the Plan. *See* 29 U.S.C. § 1002(16)(A)(i); Exhibit A, at CODAY.00022. However, defendant makes claim decisions and insures the Plan. The Plan vests defendant with discretionary authority. The Summary Plan Description ("SPD") for the Plan, *Id.* at CODAY.00001–25, governs the claims process and sets forth the extent of defendant's discretionary authority under the Plan. In the "ERISA Information Section" of the SPD, the Plan specifies that "the Plan administrator and other Plan fiduciaries shall have discretionary authority to interpret the terms of the Plan and to determine eligibility for and entitlement to Plan benefits in accordance with the terms of the Plan." *Id.* at CODAY.00023. The Plan gives defendant's discretionary determinations "full force and effect, unless it can be shown that the interpretation or determination was arbitrary and capricious." *Id.* Application of the "arbitrary and capricious" standard is a legal exercise, but the fact that the Plan includes such language is uncontroverted.

Raytheon established the Plan to provide benefits to its employees should a participant employee become disabled. Disabled, as defined by the Plan, comprises an Injury or Sickness [that] require[s] the regular care and attendance of a doctor and:

1. During the first 15 months, including your Elimination Period, you are unable to perform each of the material duties of your regular job; and

2. After the first 15 month period, you must also be unable to perform each of the material duties of any gainful work or service for which you are reasonably qualified taking into consideration your training, education, experience and past earnings; or

3. You, while unable to perform all of the material duties of your regular job on a full-time basis, are:

    a. performing at least one of the material duties of your regular job or any other gainful work or service on a part-time or full-time basis; and

b. earning currently at least 20% less per month than your Basic Monthly Earnings due to that same Injury or Sickness.

*Id.* at CODAY.00010. "Elimination Period" is "the number of consecutive days of Disability before Long Term Disability Benefits become payable under [the] Plan." It "[b]egins on the first day of Disability." *Id.* at CODAY.00011. The Plan further describes the Long Term Disability Elimination Period as "[t]he day after sick pay benefits end, (up to a maximum of 13 weeks), or 30 calendar days after your first day of Disability, whichever is longer." *Id.* at CODAY.00005.

Other relevant provisions in the Plan include a provision for Plan ordered medical examinations. The Plan states, "while a claim is pending, [the Plan has] the right to have you examined by Doctors of our choice when and as often as we reasonably choose." *Id.* at CODAY.00018. Defendant did not exercise this provision in the present case.

Plaintiff worked at Raytheon as a Section Manager until March 23, 2000. On March 30, 2000, plaintiff underwent mitral valve replacement surgery, which included the insertion of a permanent pacemaker. The surgery was followed by cardiac rehabilitation which was completed at the end of August 2000. On June 22, 2000, plaintiff submitted a claim for LTD benefits to defendant. Ms. Anne Marie Monaco, a case manager with defendant, processed the claim. The parties seem to dispute the contents of an "Employer's Statement" dated June 21, 2000, which described the physical and mental requirements of plaintiff's position as a Section Manager. To avoid any issue as to characterization, the court will include the full content of the Statement. Defendant accurately states that plaintiff's position required her to sit and operate a computer for 61% to 100% of the working day and to stand, walk, bend, squat, etc. only 1%–19% of the working day. *Id.* at CODAY.00170. The Statement described plaintiff's supervisory functions as follows:

Could have up to several analysts reporting to her. The job is a high stress level due to deadlines and processing a great deal of information where accuracy is required. Requires concentration for extend [sic] period[s] of time and a lot of memory. Have to be able to use a great deal of judgment and be able to communicate extremely well.

*Id.* at CODAY.00171.

Plaintiff's claim file also included medical statements signed by Dr. James Fast and plaintiff's cardiologist, Dr. James Neel. Both statements were completed on June 16, 2000. Dr. Fast's statement indicated his belief that plaintiff was totally disabled and unable to perform her job due to the stress level. Dr. Neel indicated that he was "unable to determine" if and when plaintiff would be able to return to work. *Id.* at CODAY.00137. In a letter dated August 28, 2000, Dr. Neel further states that plaintiff "is not to return to work at present time." *Id.* at CODAY.00112. In a letter dated July 28, 2000, defendant informed plaintiff that LTD benefits were payable commencing June 27, 2000, through August 31, 2000. Defendant had determined that plaintiff was unable to perform her job due to "mitral valve failure, migraines, stress, and depression." Defendant informed plaintiff that if her condition persisted beyond August 31, 2000, it would require "specific medical information" in order to consider an extension or continuation of benefits. Specifically, defendant requested "progress notes from Cardiac Rehab." *Id.* at CODAY.00160.

On August 9, 2000, plaintiff provided defendant with the requested additional

information in the form of her Cardiac Rehabilitation Exercise Records. *Id.* at CODAY.00139–143. The records indicate that plaintiff attended rehabilitation 15 times from May 24, 2000 through August 2, 2000. On visits 1, 3, 6, 7, 8, 10, 11, 13, and 15, plaintiff experienced no adverse effects from the rehabilitation exercises. On visit 2, plaintiff experienced dizziness after engaging in the exercises. On visits 4, 5, and 9, plaintiff experienced fatigue upon exercising. On visit 12, plaintiff experienced slight soreness in her chest, which subsided after some warm-up exercises. Finally, on visit 14, plaintiff became very sweaty during her rehabilitation and subsequently lost vision in her left eye. *Id.* at CODAY.00143. Dr. Neel was contacted regarding this event.

Plaintiff also provided an updated medical statement from Dr. Neel, dated August 2, 2000. In this statement, Dr. Neel indicated that plaintiff had experienced "vision changes, shortness of breath, chest pains, and stress." He further stated that, on the day of the visit, plaintiff's appearance was "well developed, respiratory was normal, cardiovascular rhythm and pulse were regular, gait normal, and neurological exam normal." *Id.* at CODAY.00091. Plaintiff again met with Dr. Neel who faxed another update to defendant on August 25, 2000. The statement indicated that plaintiff continued to have symptoms of "chest pain, presyncope, palpitations, and migraines." *Id.* at CODAY.00112. Dr. Neel plainly stated that plaintiff was unable to return to work at the time of the report and that he could not predict when plaintiff would be able to return. Defendant had specifically requested any updated test results. Dr. Neel referred defendant to the medical records and test results already provided. By letter dated September 11, 2000, defendant advised plaintiff that it was denying additional LTD benefits after August 31, 2000. *Id.* at CODAY.00090–91. The letter set out many of the facts listed above and concluded that "the information provided does not clearly establish the existence of a condition which would prevent you from returning to your job, ..." *Id.*

By letters dated September 21 and October 2, 2000, plaintiff exercised her right under the Plan for review of her claim. Plaintiff also provided additional information to add to her claim file. Included were sleep study reports and office notes from Dr. Bradley K. Bittle, a sleep specialist, and Dr. Rizwan Hassan, a neurologist. Plaintiff had visited Dr. Hassan upon Dr. Neel's recommendation after she lost vision after an exercise program. Dr. Neel was concerned that the loss of vision might be a sign of transient ischemic attacks ("TIA"). Additionally, defendant delivered plaintiff's file to Network Medical Review to have an independent physician consultant review plaintiff's condition. Dr. Parag Patel, a cardiologist, and Dr. Barry Weber, a neurologist, both reviewed plaintiff's file and returned a report on November 3, 2000.

Dr. Patel stated that plaintiff's cardiac functions were "nearly normal" and that evidence in the record did not support a finding of "more than a mild impairment of her cardiac function." He concluded that "[f]rom a cardiovascular standpoint, based upon the available data she is able to return to work." *Id.* at CODAY.00045. Dr. Patel also noted that Dr. Hassan's notes reflecting a September 11, 2000 consultation with plaintiff made no mention of loss of vision. Dr. Weber's review concluded that plaintiff had a mild form of both obstructive sleep apnea and depression.

Dr. Weber discussed plaintiff's conditions with Dr. Hassan. Dr. Hassan indicated that plaintiff's "headaches were no longer a problem and that a diagnosis of

TIA was not a current active diagnosis." *Id.* at CODAY.00047. Dr. Hassan indicated that "from the limited perspective of her headaches, [plaintiff] was ready to return to work." *Id.* at CODAY.00049. Dr. Weber does not directly discuss the impact of plaintiff's sleep apnea and depression on her ability to return to work, but concluded that "[f]rom a neurology perspective, based upon the available data she is able to return to work." *Id.* However, Dr. Weber did recommend that plaintiff's work must have limited stress and no ongoing critical decision making. *Id.* at CODAY.00048.

On November 6, 2000, plaintiff provided more medical information. Defendant informed her that the information was already on file and had been considered by the independent reviewing physicians. On November 15, 2000, defendant notified plaintiff that it would uphold its initial determination that plaintiff was not entitled to LTD benefits.

## II. Summary Judgment Standards

Summary judgment is proper where the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). In considering a motion for summary judgment, the court must examine all of the evidence in a light most favorable to the opposing party. *Jurasek v. Utah State Hosp.,* 158 F.3d 506, 510 (10th Cir. 1998). The party moving for summary judgment must demonstrate its entitlement to summary judgment beyond a reasonable doubt. *Baker v. Board of Regents,* 991 F.2d 628, 630 (10th Cir.1993). The moving party need not disprove the nonmoving party's claim or defense; it need only establish that the factual allegations

have no legal significance. *Dayton Hudson Corp. v. Macerich Real Estate Co.,* 812 F.2d 1319, 1323 (10th Cir.1987).

The party opposing summary judgment must do more than simply show there is some metaphysical doubt as to the material facts. "In the language of the Rule, the nonmoving party must come forward with 'specific facts showing that there is a *genuine issue for trial.*'" *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (quoting Fed.R.Civ.P. 56(e)) (emphasis in *Matsushita*). The opposing party may not rely upon mere allegations or denials contained in its pleadings or briefs. Rather, the opposing party must present significant admissible probative evidence supporting that party's allegations. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

## III. Analysis and Discussion

■ As noted above, the Plan is an employee welfare benefit plan as defined and governed by ERISA. *See* 29 U.S.C. § 1002(3). Because ERISA governs the Plan, plaintiff's sole cause of action arises under the statutory remedies provided therein. As the Supreme Court noted in *Massachusetts Mut. Life Ins. Co. v. Russell,* 473 U.S. 134, 146, 105 S.Ct. 3085, 87 L.Ed.2d 96 (1985), "[t]he six civil enforcement provisions found in § 502(a) of the statute ... provide strong evidence that Congress did not intend to authorize other remedies that it simply forgot to incorporate expressly." In reviewing an ERISA plan administrator's denial of benefits, courts "generally may consider only the arguments and evidence before the administrator at the time it made that decision." *Chambers v. Family Health Plan Corp.,* 100 F.3d 818, 823 (10th Cir.1996) (citing

*Sandoval v. Aetna Life & Cas. Ins. Co.,* 967 F.2d 377, 380 (10th Cir.1992)).

In *Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 115, 109 S.Ct. 948, 956, 103 L.Ed.2d 80, (1989), the Supreme Court held that "a denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a de novo standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." If the plan gives the administrator discretionary authority, the arbitrary and capricious standard applies. *Id.* As noted above, the Plan gives its administrator and other fiduciaries "discretionary authority to interpret the terms of the Plan and to determine eligibility for and entitlement to Plan benefits." Exhibit A, at CODAY.00023. Thus, under *Firestone,* the court must uphold defendant's decision to deny plaintiff benefits unless it was arbitrary and capricious.

However, plaintiff points out that an inherent conflict of interest arises where, as here, an insurance carrier both issues a policy and administers it. In its brief in support, at statement of uncontroverted fact number 8, defendant states that it both insures the Plan and administers all claims under the Plan. Thus, plaintiff's assertion of conflict is well taken. The Tenth Circuit directly addressed this issue in *Pitman v. Blue Cross and Blue Shield of Oklahoma,* 217 F.3d 1291 (10th Cir. 2000). In *Pitman,* the court considered Blue Cross' potential conflict as a plan insurer and plan administrator and stated:

> Blue Cross is in the business of insurance. Thus, it can only remain economically viable through its insurance transactions. By contrast, self-funded companies typically have other means of generating profit and income. Thus, in Blue Cross' situation, as both insurer and administrator of the plan, there is an inherent conflict of interest between its discretion in paying claims and its need to stay financially sound.

*Id.* at 217 F.3d at 1297, n. 4.[1] On the issue of an inherent conflict, the court finds no distinction between Blue Cross and Blue Shield in *Pitman* and defendant in this case. Pursuant to *Pitman,* the court concludes that defendant made its decision in this case while operating under an inherent conflict of interest.

In *Chambers v. Family Health Plan,* 100 F.3d 818 (10th Cir.1996), the Tenth Circuit clarified the standard of review appropriate for cases in which a conflict of interest is present. The appropriate standard in such cases is the "sliding-scale" approach, under which "the reviewing court will always apply an arbitrary and capricious standard, but the court must decrease the level of deference given to the conflicted administrator's decision in proportion to the seriousness of the conflict." *Chambers,* 100 F.3d at 825. In other words,

> to the extent that [defendant] has discretion to avoid paying claims, it thereby promotes the potential for its own profit .... In short, [defendant's] decision will be entitled to some deference, but [this] deference will be lessened to the degree necessary to neutralize any untoward influence resulting from the conflict.

*Id.* at 826 (quoting *Pitman,* 24 F.3d at 123 (quoting *Doe v. Group Hospitalization & Med. Servs.,* 3 F.3d 80, 86 (4th Cir.1993))).

---

1. The court notes that in *Jones v. The Kodak Medical Assistance Plan,* 169 F.3d 1287 (10th Cir.1999), the Tenth Circuit set forth a number of example factors for courts to consider in deciding whether a conflict of interest exists. These factors, however, focus on conflicts of interest which may arise in the context of self-funded plans and are not applied effectively in this case where the plan is not self-funded, and defendant is the insurer.

Recognizing the need for a proportional decrease in deference, the court still must apply the arbitrary and capricious standard. When reviewing under the arbitrary and capricious standard, "[t]he Administrator['s] decision need not be the only logical one nor even the best one. It need only be sufficiently supported by facts within [his] knowledge to counter a claim that it was arbitrary or capricious." *Woolsey v. Marion Laboratories, Inc.*, 934 F.2d 1452, 1460 (10th Cir.1991). The court will uphold the decision unless it is "not grounded on any reasonable basis." *Id.* (citation omitted). The reviewing court "need only assure that the administrator's decision fall[s] somewhere on a continuum of reasonableness—even if on the low end." *Kimber v. Thiokol Corp.*, 196 F.3d 1092, 1098 (10th Cir.1999) (quoting *Vega v. National Life Ins. Serv., Inc.*, 188 F.3d 287, 297 (5th Cir.1999)).

██ Turning to the record, the court must determine if record facts sufficiently supported defendant's decision to deny plaintiff's request for LTD benefits. Included in the record is an "Employer's Statement" indicating that plaintiff's position at Raytheon presented a "high stress level due to deadlines and processing a great deal of information where accuracy is required" and that the position required plaintiff "to be able to use a great deal of judgment." Also included in the record were the opinions of plaintiff's two treating physicians. Dr. Fast indicated that plaintiff was totally disabled. CODAY.00218. He further states that "the level of stress in [plaintiff's] present job is completely unacceptable and not conducive to recov-

ery." CODAY.00217. Dr. Neel indicated, on August 25, 2000, that plaintiff was unable to return to work at that time and that he could not determine when plaintiff would be able to return to work.[2] CODAY.00112. This was consistent with Dr. Neel's June 16, 2000 statement indicating that he was unable to determine whether plaintiff was totally disabled. CODAY.00178. In the June 16, 2000 report, Dr. Neel stated that plaintiff had only slight cardiac related limitations, but that plaintiff had a class 3, or moderate mental/nervous impairment. CODAY.00177. Expanding on this, Dr. Neel states, "[t]his patient is not to be placed in a position that induces physical or mental stress." *Id.*

On appeal, defendant delivered plaintiff's medical information to Network Medical Review for independent review. Two independent physicians reviewed the file. First, Dr. Patel, a cardiologist, concluded that there was no evidence in the records of more than a mild impairment of plaintiff's cardiac function and that objective clinical findings do not substantiate her cardiac symptoms. CODAY.00041–46. He specifically stated that "from a cardiovascular standpoint, based on the available data she is able to return to work." CODAY.00045. Dr. Patel's opinion, as it pertains to cardiac impairment, was in line with Dr. Neel's opinion that plaintiff suffered from only slight cardiac related limitations. Like Dr. Neel, Dr. Patel also discussed plaintiff's neurological/functional impairments, stating:

---

**2.** Dr. Neel specifically found that plaintiff still had symptoms of "chest pain, presnycope, palpitations, and migraines." CODAY.00112. Defendant argues that he failed to submit office notes or other test results to support his new findings. Dr. Neel's opinions are on the record and are relevant given that he con-

ducted a physical examination of plaintiff the day before submitting the information. Thus, defendant's must have considered his opinion in reaching its decision. It is reasonable, however, for defendant to give reduced weight to Dr. Neel's opinion due to the lack of supporting documentation.

Currently her symptoms are primarily neurological and are not directly related to her cardiovascular impairments and limitations.... She should be able to perform sedentary work. Her ability to concentrate and perform administrative duties may be impaired, based upon neurological symptoms and dysfunction, not a cardiovascular impairment.

CODAY.00045. Dr. Patel thus refers the reader to the neurological review of Dr. Weber. Dr. Weber's ultimate opinion was that "[f]rom a neurology perspective, based upon the available data she is able to return to work." CODAY.00049. However, Dr. Weber's comments in reaching that conclusion also merit review. He found that plaintiff suffered from mild obstructive sleep apnea, mild insomnia likely related to depression, and mild and irregular migraines. He specifically stated that "[plaintiff]'s symptoms and signs correlate quite well with what is expected in the conditions of obstructive sleep apnea and headache due to either psychological stress and/or migraine." CODAY.00048. In view of these conditions, Dr. Weber recommended "that her work has limited stress and that there is not ongoing critical decision-making required in her duties. This **restriction** is based upon her altered concentration, again related to the headaches and sleep loss." *Id.* (emphasis added). In summary, Dr. Weber found that, from a neurological perspective, plaintiff was ready to return to work which was consistent with the above restriction, i.e., to work that engendered limited stress and did not require ongoing critical decision making.

To receive LTD benefits, plaintiff had to demonstrate that she was disabled as defined by the Plan, i.e., that she was "unable to perform each of the material duties of [her] regular job." Defendant's Statement of Uncontroverted Fact, ¶ 4. As set out above, plaintiff's regular job was of a high stress nature, required the frequent use of judgment, and the ability to accurately process a great deal of information. In making and reviewing its determination, defendant considered the opinions of four doctors. Dr. Fast concluded plaintiff was totally disabled and that the level of stress in plaintiff's job was completely unacceptable. Dr. Neel found that plaintiff had minimal cardiovascular limitations, but moderate mental/nervous impairment, requiring that plaintiff not "be placed in a position that induces physical or mental stress." Similarly, Dr. Patel concluded that plaintiff's cardiovascular condition was not significantly limiting, but that "[h]er ability to concentrate and perform administrative duties may be impaired, based upon neurological symptoms and dysfunction." Finally, Dr. Weber concluded that, from a neurological standpoint, plaintiff was ready to return to work with the recommended restriction that plaintiff's "work has limited stress and that there is not ongoing critical decision-making required in her duties." The court concludes that "ongoing critical decision-making" is synonymous with the "use of a great deal of judgment." Thus, the record does not provide any evidence to support the conclusion that plaintiff was prepared to reenter a position that required high stress levels and frequent use of judgment or decision-making skills. In fact, each of the doctors stated the opinion that plaintiff should not work in such a position due to her neurological ailments. The court concludes that defendant's determination is unsupported by the evidence on record. To be clear, the evidence supports the conclusion that plaintiff is not disabled due to a cardiovascular condition. However, each of the relevant medical experts indicates that while plaintiff could return to work in general, she was not to engage in work that was highly stressful or that re-

quired significant concentration or decision-making. Because plaintiff's regular job involves high stress levels and requires concentration and frequent exercises of judgment, the medical evidence does not support defendant's conclusion of non-disability. The decision was not "sufficiently supported by facts" in the record. *Woolsey*, 934 F.2d at 1460. Given that the court accords defendant's decision a lesser degree of deference to the degree necessary to purge the inherent conflict in this case, the court concludes that defendant's decision does not pass review at this stage of the proceeding and thus denies defendant's motion for summary judgment.

IT IS THEREFORE ORDERED this 8 day of February, 2002, that defendant's motion for summary judgment (dkt. no. 11) is denied.