**Carlene EYE, Plaintiff,**

v.

**METROPOLITAN LIFE INSURANCE CO., Defendant.**

**No. 01–1007–JAR.**

United States District Court,
D. Kansas.

April 22, 2002.

John L. Brennan, Brennan & Keil, Wichita, KS, for Plaintiff.

Jeffrey A. Burns, Douglas W. Robinson, Shook, Hardy & Bacon L.L.P., Kansas City, KS, for Defendant.

*MEMORANDUM AND ORDER DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT*

ROBINSON, District Judge.

This matter is before the Court on Defendant Metropolitan Life Insurance Company's ("MetLife") motion for summary judgment (Doc. 13) against Plaintiff Carlene Eye ("Eye"). Eye contends that MetLife acted arbitrarily and capriciously when it denied her claim for long-term disability benefits under a private disability plan (the "Plan") maintained by MetLife on behalf of Eye's employer, Raytheon Aircraft ("Raytheon"). MetLife brings this motion for summary judgment contending that the administrative record did not support Eye's claim and that no reasonable juror could find that MetLife's decision was arbitrary and capricious. For the reasons set forth below, MetLife's Motion for Summary Judgment is Denied.

## I. Facts

The Plan, which is an employee welfare benefit plan governed by the Employee Retirement Income Security Act of 1974 ("ERISA"), is administered by Raytheon; however, MetLife insures the Plan and functions as the administrator by making claim decisions under the Plan.[1] The Plan vests MetLife with discretionary authority. In the "ERISA Information Section" of the Summary Description Plan, the Plan states that "the Plan administrator and other Plan fiduciaries shall have discretionary authority to interpret the terms of the Plan and to determine eligibility for and entitlement to Plan benefits in accordance with the terms of the Plan."[2]

Raytheon established the Plan to provide benefits to its employees should a

---

1. Exhibit A to MetLife's Memorandum in Support of Its Motion for Summary Judgment at p. 0292 (MET.0292).

2. MET.0293.

participant employee become disabled. The Plan defines "disabled" as "an Injury or Sickness [that] require[s] the regular care and attendance of a doctor" and:

1. During the first 15 months, including your Elimination Period, you are unable to perform each of the material duties of your regular job; and

2. After the first 15 month period, you must also be unable to perform each of the material duties of any gainful work or service for which you are reasonably qualified taking into consideration your training, education, experience and past earnings; or

3. you, while unable to perform all of the material duties of your regular job on a full-time basis, are:

   a. performing at least one of the material duties of your regular job or any other gainful work or service on a part-time or full-time basis; and

   b. earning currently at least 20% less per month than your Basic Monthly Earnings due to that same Injury or Sickness.[3]

"Elimination Period" is "the number of consecutive days of Disability before Long Term Disability Benefits become payable under [the] Plan."[4] It "begins on the first day of Disability."[5] The Plan further describes the Long Term Disability Elimination Period as "the day after sick pay benefits end, (up to a maximum of 13 weeks), or 30 calendar days after your first day of Disability, whichever is longer."[6]

Eye was last employed at Raytheon as a Sigma Six Expert, a sedentary job that requires her to sit 61%—100% of the day, and stand or walk 1%—19% of the day. Eye's last day of employment with Raytheon was April 18, 2000. On March 2, 1999, Eye filed an "Employee's Report of Incident," listing the injury as carpel tunnel and tendinitis and claiming the dates of the incident from "1995 to 1999." Eye's claim for long-term disability benefits was submitted to a MetLife Case Manager on June 1, 2000. On or about July 31, 2000, MetLife advised Eye that her claim for long-term disability benefits was denied based on the documentation in her files.

Eye's claim file included Eye's medical records from two treating doctors, a review of those records by a doctor referred by MetLife, Dr. Greenhood, and a surveillance videotape of Eye taped over the course of several days. According to Eye's treating physicians, Dr. Hartley and Dr. Hunninghake, she suffered from extreme fibromyalgia and chronic fatigue syndrome. In notes dated May 1, 2000, Dr. Hunninghake noted that Eye was incapable of minimum (sedentary) movement and was totally disabled from any occupation. On May 15, 2000, Dr. Hartley came to the same conclusion as Dr. Hunninghake that Eye could not perform minimum (sedentary) movement and that she was totally disabled from any occupation. On a June 22, 2000 questionnaire, Dr. Hunninghake indicated that 5–minute rest periods or other accommodations would not help Eye and that Eye's pain was unremitting. On September 27, 2000, Dr. Hunninghake limited Eye from any work, noting that these restrictions were permanent. On October 23, 2000, Dr. Hunninghake completed a Medical Source Statement–Physical where he stated that Eye could sit continuously for fifteen minutes (squirming), sit for a total of one hour in an eight hour day, and must lie down or recline for one to two hours every morning and afternoon. Dr. Hunninghake also expressed to

---

3. MET.0280.

4. MET.0281.

5. *Id.*

6. MET.0275

Dr. Greenhood that Eye was in the worst 10%—20% of his patient population and has "one of the most severe cases of fibromyalgia" in his practice.

Eye used a cane at work and the surveillance videotape also showed her using a cane and a motorized cart. The reports of the surveillance videotape stated that plaintiff was observed "standing, walking, sitting, bending, lifting, carrying, pumping gas, [and] driving." More specifically, the report indicated that Eye "exited the supermarket driving a motorized cart . . . she exited her vehicle carrying a brown paper bag in her right hand and utilizing the support of a cane with her left hand . . . did not use the cane for support while she carried the last two bags into the residence . . . [and] she used a cane all the time with the exception of when she was in the cart and when she carried the groceries from the car to the house."

At the time of the initial review, the physician-consultant referred by MetLife, Dr. Greenhood, was unable to fully review some of Eye's diagnoses because the record did not contain the results of certain tests and because of perceived inconsistencies in the file.

In a letter dated August 14, 2000, Eye exercised her right under the Plan for a review of her denied claim. Around October 10, 2000, Eye provided additional information to add to her claim file, including additional medical records and treatment notes noted above. These treatment notes also contained the results of certain tests that supported a diagnosis of fibromyalgia. In addition, in December of 2000 Eye applied for and was awarded Social Security disability benefits, which was also noted in the administrative record.

The physician-consultant referred by MetLife, Dr. Greenhood, reviewed these additional records and concluded that Eye was capable of performing her job as a Six Sigma Expert and that there was no evidence tending to prove that she could not perform her sedentary job. He stated that it was "more likely than not" that Plaintiff could function in a predominantly sedentary occupation. He also stated:

> My opinion regarding Ms. Eye's functional capacity does not conform to that expressed on 11/21/00 to me by Dr. Hunninghake. Dr. Hunninghake has had the advantage of interviewing and examining Ms. Eye. My impression of Dr. Hunninghake from our telephone conversations in July and November 2000 was that he was a knowledgeable, credible, and caring physician. He expressed to me that Ms. Eye is in the worst 10–20% of his patient population and has "one of the most severe cases of fibromyalgia" in his practice. He stated that most patients with fibromyalgia are able to drive, shop, walk, etc. and are not bed-ridden.
>
> If a decision regarding work ability is to be decided on the basis of the patient's demonstrated functional abilities, then I believe that the activities shown in the surveillance videotape cannot be refuted. In my judgment, these activities imply that at the time of the taping, it is more likely than not that Ms. Eye had sedentary work capacity.

In addition, Dr. Greenhood also reported that he found Dr. Hunninghake was credible and that Dr. Hunninghake's diagnosis "may be a reasonable conclusion." Around December 14, 2000, MetLife informed plaintiff that it had reviewed her entire record, including the additional information Eye submitted, and that it would uphold its determination that Eye was not entitled to long-term disability benefits under the Plan. Specifically, it concluded "we continue to lack evidence of a severe functional impairment that would prevent Ms. Eye from performing her job."

## II. Summary Judgment Standard

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."[7] A factual dispute is "material" only if it "might affect the outcome of the suit under the governing law."[8] An issue of fact is genuine if the evidence is sufficient for a reasonable jury to return a verdict for the nonmoving party.[9] The moving party bears the initial burden of showing that there is an absence of any genuine issue of material fact.[10] Once the moving party meets its burden, the burden shifts to the nonmoving party to demonstrate that genuine issues remain for trial "as to those dispositive matters for which it carries the burden of proof."[11] The nonmoving party may not rest on its pleadings but must set forth specific facts.[12] The Court must consider the record in the light most favorable to the party opposing the motion.[13] The Court determines "whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law."[14] In making such a determination, the Court should not weigh the evidence or credibility of witnesses. In determining whether any genuine issues of material fact exist, the Court must construe the record liberally in favor of the party opposing summary judgment.[15] If an inference can be deduced from the facts that would allow the nonmovant to prevail, summary judgment is inappropriate.

## III. Review of Denial of Benefits Under ERISA

### A. Standard of Review

In *Firestone Tire & Rubber Co. v. Bruch*, the Court held "a denial of benefits challenged under 29 U.S.C. § 1132(a)(1)(B) is to be reviewed under a de novo standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan."[16] If the plan administrator has discretionary authority to determine eligibility for benefits or construe the plan's terms, then a court will apply an "arbitrary and capricious" standard to the administrator's actions.[17] The parties agree that MetLife had discretion to determine eligibility and that an arbitrary and capricious standard of review is the proper standard. However, Eye argues that MetLife was operating under a conflict of interest and, therefore,

7. Fed.R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Vitkus v. Beatrice Co.*, 11 F.3d 1535, 1538–39 (10th Cir.1993).

8. *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505.

9. *Id.* at 248, 106 S.Ct. 2505.

10. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Hicks v. Watonga*, 942 F.2d 737, 743 (10th Cir. 1991).

11. *Applied Genetics Int'l Inc. v. First Affiliated Secs., Inc.*, 912 F.2d 1238, 1241 (10th Cir. 1990) (citing *Celotex*, 477 U.S. at 324, 106 S.Ct. 2548).

12. *Id.*

13. *Bee v. Greaves*, 744 F.2d 1387, 1396 (10th Cir.1984), *cert. denied*, 469 U.S. 1214, 105 S.Ct. 1187, 84 L.Ed.2d 334 (1985).

14. *Anderson*, 477 U.S. at 251–52, 106 S.Ct. 2505.

15. *McKibben v. Chubb*, 840 F.2d 1525, 1528 (10th Cir.1988) (citation omitted).

16. 489 U.S. 101, 115, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989).

17. *Id.*

the Court should grant less deference to the administrator's decision.[18]

■ The court in *Kimber* noted that "[a] conflict of interest can arise between a plan administrator's duty to act 'solely in the interest of the participants and beneficiaries' of the plan [under Section 1104(a)(1) ] and his self interest or loyalty to his employer."[19] When this conflict exists and the administrator has discretion under the plan, the conflict of interest must be weighed as a "factor in determining whether there is an abuse of discretion."[20] "The standard always remains arbitrary and capricious but the amount of deference present may decrease 'on a sliding scale in proportion to the extent of conflict present, recognizing the arbitrary and capricious standard is inherently flexible.'"[21]

■ Before applying a sliding scale analysis, Eye must put forth evidence of a conflict of interest.[22] Eye contends that MetLife was operating under a conflict of interest because it was both the plan administrator and the insurer. In deciding whether a conflict of interest existed, the Court should consider various, non-exhaustive factors, including whether:

(1) the plan is self-funded; (2) the company funding the plan appointed and compensated the plan administrator; (3) the plan administrator's performance reviews or level of compensation were linked to the denial of benefits; and (4) the provision of benefits had a significant economic impact on the company administering the plan.[23]

The administration of this plan is nearly identical to that in *Pitman.* Similar to that case, "although this plan is not self-funded, [MetLife] is both the insurer and the administrator of the plan."[24] Another court noted, "when an insurance company serves as ERISA fiduciary to a plan composed solely of a policy or contract issued by that company, it is exercising discretion over a situation for which it incurs direct, immediate expense as a result of benefit determinations favorable to plan participants."[25]

The court in *Pitman* also correctly pointed out that this situation is much different from a situation where the plan administrator who also pays the claims is not an insurance company. It stated that:

[U]nlike the self-funded company in *Kimber* where the company's profit is not derived solely from its administration of the health benefits plan, [Defendant] is in the business of insurance. Thus, it can only remain economically viable through its insurance transactions. By contrast, self-funded companies typically have other means of generating profit and income. Thus, in

---

**18.** See *Kimber v. Thiokol Corp.,* 196 F.3d 1092, 1097 (10th Cir.1999) (citing *Chambers v. Family Health Plan Corp.,* 100 F.3d 818, 825 (10th Cir.1996)) (noting that a conflict of interest "triggers a less deferential standard of review.").

**19.** *Id.*

**20.** *Firestone,* 489 U.S. at 115, 109 S.Ct. 948 (citation omitted).

**21.** *Kimber,* 196 F.3d at 1097 (quoting *McGraw v. Prudential Ins. Co.,* 137 F.3d 1253, 1258 (10th Cir.1998)).

**22.** *Id.*

**23.** *Pitman v. Blue Cross and Blue Shield,* 217 F.3d 1291, 1296 (10th Cir.2000); *Jones v. Kodak Med. Assistance Plan,* 169 F.3d 1287, 1292 (10th Cir.1999); *Kimber,* 196 F.3d at 1098.

**24.** *Pitman,* 217 F.3d at 1296.

**25.** *Id.* (quoting *Brown v. Blue Cross and Blue Shield,* 898 F.2d 1556, 1561 (11th Cir.1990), *cert. denied* 498 U.S. 1040, 111 S.Ct. 712, 112 L.Ed.2d 701 (1991)); *Doe v. Group Hospitalization & Med. Servs.,* 3 F.3d 80, 86 (4th Cir.1993).

[Defendant's] situation, as both insurer and administrator of the plan, there is an inherent conflict of interest between its discretion in paying claims and its need to stay financially sound.[26] Likewise, MetLife is both the insurer and administrator of Raytheon's ERISA plan. Therefore, this Court holds ·that there is an inherent conflict of interest and a sliding scale analysis shall be applied to the arbitrary and capricious standard.[27]

### B. Arbitrary and Capricious

■■■■ While still applying a proportional decrease in deference due to an inherent conflict of interest, the Court still must apply the arbitrary and capricious standard. In reviewing administrator's decisions, the "decision need not be the only logical one nor even the best one. It need only be sufficiently supported by facts within [MetLife's] knowledge to counter a claim that it was arbitrary or capricious."[28] The decision of MetLife will be upheld unless it is "not grounded on any reasonable basis."[29] The Court "need only assure that [MetLife's] decision fall[s] somewhere on a continuum of reasonableness-even if on the low end."[30] Thus, the Court must determine if the record sufficiently supported MetLife's decision to deny Eye's request for long-term disability benefits.

■■■■ A reasonable jury could find that MetLife's decision was not sufficiently supported by the facts and was therefore arbitrary and capricious. MetLife's final letter denying Eye's long-term disability claim recounts the facts it relied on in denying the claim. MetLife's claim must be made on the entire record; however, a reasonable jury could find that MetLife's decision was made solely on the basis of the surveillance videotape and testimony regarding this tape. In addition, there is no indication that MetLife even considered the fact that Eye had received Social Security disability benefits-a fact which was included in the administrative record. Although the standards between the two disability benefits are different and an award of Social Security disability benefits does not dispose of the issue of benefits under the Plan, MetLife should have considered this fact when it made its determination.

MetLife's denial letter emphasized that the· surveillance videotape shows · Eye "driving an automobile, pumping gasoline ... and lifting objects."[31] Yet, she also was almost completely reliant on a cane or cart for mobility. MetLife then concludes that, because Eye has some mobility and can "bend, twist, stoop" and use her hands, she is able to function at a job where she predominately sits. Yet, the videotape is consistent with the reports of Eye's treating physicians. The physicians were not concerned with Eye's movement, but rather her inability to "sit continuously for fifteen minutes" without squirming and that she could only sit for one hour of an eight hour day. The videotape shows periods of activity, not inactivity. It was also done in short clips, leaving open the possibility that Eye required periods of rest between the periods of activity. In addi-

---

26. *Pitman,* 217 F.3d at 1297.

27. *See generally Coday v. Metropolitan Life Insurance Co.,* 183 F.Supp.2d 1332 (D.Kan. 2002). This Court also incorporates by reference the holding in *Coday* with respect to a conflict of interest under the same plan by the same company with the same insurer.

28. *Woolsey v. Marion Laboratories, Inc.,* 934 F.2d 1452, 1460 (10th Cir.1991).

29. *Id.* (citation omitted).

30. *Kimber v. Thiokol Corp.,* 196 F.3d 1092, 1098 (10th Cir.1999) (quoting *Vega v. Nat'l Life Ins. Serv., Inc.,* 188 F.3d 287, 297 (5th Cir.1999)).

31. MET.0005.

tion, MetLife's own physician states that Eye's treating physicians were credible, that their diagnoses could be reasonable, and acknowledges that they had "the advantage of interviewing and examining Ms. Eye." [32] His conclusion, based on his observations of the videotape, is that it was "more likely than not" that Eye could function in a position in which she predominantly sits. This conclusion also does not take into account the diagnoses and observations made by Eye's treating physicians.

MetLife's decision was not "sufficiently supported by facts" in the record. Given that the Court accords MetLife's decision a less degree of deference to the degree necessary to purge the inherent conflict of interest in this case, the Court concludes that MetLife's decision does not pass review at this stage of the proceeding and thus denies defendant's motion for summary judgment.

**IT IS THEREFORE ORDERED** that MetLife's motion for summary judgment is DENIED.

IT IS SO ORDERED.